UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------

DOMINIC DANIELE,

                     Plaintiff,

       v.

COMMISSIONER OF SOCIAL SECURITY,

                     Defendant.

-------------------------------------------------------------

**<u>MEMORANDUM & ORDER</u>**
15-CV-2689 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Dominic Daniele filed the above-captioned action pursuant to 42 U.S.C.

§ 405(g) seeking review of a final decision of the Commissioner of Social Security (the

"Commissioner") denying his claim for disability insurance benefits.  The Commissioner moves

for judgment on the pleadings, arguing that the decision by Administrative Law Judge Jack

Russak (the "ALJ") is supported by substantial evidence and should be affirmed.  (Comm'r Not.

of Mot. for J. on Pleadings, Docket Entry No. 11; Comm'r Mem. in Supp. of Mot. for J. on the

Pleadings ("Comm'r Mem."), Docket Entry No. 12.)  Plaintiff cross-moves for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that the ALJ's

decision is not supported by substantial evidence.  (Pl. Cross-Mot. for J. on Pleadings, Docket

Entry No. 15; Pl. Mem. in Supp. of Cross-Mot. for J. on the Pleadings ("Pl. Mem."), Docket

Entry No. 15-1.)  For the reasons set forth below, the Commissioner's motion for judgment on

the pleadings is granted and Plaintiff's cross-motion for judgment on the pleadings is denied.

### I.    Background

      Plaintiff was born in 1971 and completed college.  (R. 153, 156, 186.)  From 1996 to

August 31, 2010, Plaintiff worked as a police officer for the New York City Police Department

(the "NYPD").  (R. 12, 174–75, 204.)  In 2006, Plaintiff injured his back in a car accident while on duty.  (R. 12–13, 204, 209–22, 259.)  Following the accident, the NYPD put Plaintiff on "light duty" until September 2010, when he retired on a disability pension.  (R. 156, 204.)

On March 6, 2012, Plaintiff applied for disability insurance benefits, alleging that he was disabled since September 1, 2010, due to spinal disease.  (R. 28 132–36, 156.)  Plaintiff's application was denied.  (R. 28, 37–42, 43–48.)  Plaintiff requested a hearing before the ALJ, which was held on October 25, 2013, and at which Plaintiff amended his claim to request a closed period of disability from September 1, 2010 through September 1, 2012.  (R. 20–25.)  By decision dated December 6, 2013, the ALJ found that Plaintiff was not disabled and denied Plaintiff's application.  (R. 6–19.)  On April 27, 2015, the Appeals Council denied review of the ALJ's decision.  (R. 1–3.)

### a.  Plaintiff's testimony

Plaintiff was working as a police officer in New York City and stopped working due to injuries sustained from an automobile accident that occurred while he was working. [1]  (R. 22.)

### b.  Medical evidence

#### i.  Healthcare Associates in Medicine

Following his December 26, 2006 car accident, Plaintiff was treated by various doctors at Healthcare Associates in Medicine ("Healthcare Associates").  (*See* R. 209–65.)

##### 1.  Dr. Joseph Suarez

Plaintiff was first seen by Joseph Suarez, M.D., an orthopedist, on January 12, 2007. (R. 264.)  Plaintiff reported "pain on range of motion of the lumbar spine."  (R. 264.)  Plaintiff's

---

[1]  The Court notes that this is Plaintiff's entire testimony at the hearing, which lasted for approximately four minutes.  (R. 22, 25.)

right and left lateral bending provoked pain, and his forward flexion was "full but painful." (R. 264.) Dr. Suarez referred Plaintiff to physical therapy "because the pain [was] not as severe as when he was first injured," and indicated that he would recommend a magnetic resonance imaging ("MRI") if Plaintiff "was still symptomatic at that time." (R. 264.)

Plaintiff again visited Dr. Suarez on February 23, 2007, and reported lumbosacral pain and pain in both buttocks, down the thighs. (R. 264.) Dr. Suarez observed there had been "very little improvement." (R. 264.) Plaintiff had been on mostly light duty work, and Dr. Suarez assessed a mild to moderate disability. (R. 264.) On March 16, 2007, Plaintiff's symptoms had improved and he told Dr. Suarez that, while he had "some stiffness," the pain was "certainly not as bad." (R. 264.) Dr. Suarez noted that he would "leave it up to the [NYPD] as to whether or not [Plaintiff] should return to full duty." (R. 264.)

### 2. Dr. John Shiau

On July 23, 2007, Dr. John Shiau, M.D., saw Plaintiff for a neurosurgical consultation and Plaintiff reported ongoing "intermittent lower back pain with right lower extremity radiculopathy," but noted that he had days without pain. (R. 259.) On examination, Plaintiff had full range of motion of the lumbosacral spine, and had no tenderness to palpation. (R. 259.) He walked with a normal gait. (R. 259.) Dr. Shiau recommended that Plaintiff continue physical therapy and that Plaintiff be referred to pain management for a series of lumbar epidural injections. (R. 259.)

On October 12, 2007, Dr. Shiau noted that Plaintiff had been attending physical therapy with "good result" and had been treated with one steroid injection. (R. 242.) Dr. Shiau observed that Plaintiff was "moving all extremities with good strength and power" and walking with a

normal gait. (R. 242.) Dr. Shiau recommended that Plaintiff "continue to [be] treat[ed] conservatively." (R. 242.)

Plaintiff returned to Dr. Shiau on April 4, 2008 for a neurosurgical follow-up, and Dr. Shiau noted that Plaintiff's symptoms had "stabilized" and that Plaintiff's lower extremity radiculopathy had "resolved." (R. 231.) Dr. Shiau observed that Plaintiff still had degenerative discs, a central disc herniation that was "quite large," and a degenerative disc bulge." (R. 231.) He noted that a lumbar fusion surgery "may be necessary" depending on symptoms. (R. 231.)

On July 24, 2008, Plaintiff complained to Dr. Shiau of a worsening of lower back pain and radiculopathy symptoms. (R. 225.) Dr. Shiau noted that Plaintiff reported lower back pain "mostly in the middle and towards the right and occasionally axial" and that Plaintiff's "lower extremity pain has been getting progressively worse," including numbness and tingling along his left thigh and calf. (R. 225.) Plaintiff stated that epidural injections had provided relief. (R. 225.) Plaintiff was treating his pain with Vicodin and Lyrica and was "more ready" to consider surgery, because of the worsening of his symptoms. (R. 255.) Dr. Shiau noted that Plaintiff's strength and sensory were intact, and that he had a normal gait without assistance. (R. 225.) Dr. Shiau recommended that Plaintiff continue with physical therapy and pain management and obtain an updated MRI. (R. 225.)

On September 18, 2008, Plaintiff complained to Dr. Shiau of progressively worsening back pain. (R. 221.) Plaintiff reported that physical therapy two to three times a week had provided relief, but that his back pain was persistent and worse with movement. (R. 221.) Dr. Shiau reviewed a recent MRI, which he observed revealed central disc herniations and severe degenerative discs, one of which was "quite large and worse than" in Plaintiff's prior MRI.

(R. 221.)  Dr. Shiau and Plaintiff discussed treatment options, including surgical intervention.

(R. 221.)  Dr. Shiau recommended lumbar fusion surgery.  (R. 221.)

### 3.  Dr. Germaine Rowe

On September 12, 2007, Plaintiff received the first in a series of epidural steroid injections.  (R. 243.)  Dr. Germaine N. Rowe, M.D., reported that the injections "provided virtually 100% relief" to Plaintiff, and recommended that Plaintiff continue with a home exercise program based on physical therapy and await his response to the injections to plan further treatment.  (R. 243, 245–51.)

Plaintiff received further epidural steroid injections on November 2, 2007 and February 15, 2008.  (R. 233–36, 238–242.)  On November 2, 2007, Dr. Rowe observed that Plaintiff had been managing his pain with Vicodin, Motrin and Tylenol and that physical therapy had been providing only "partial relief."  (R. 240.)  Dr. Rowe again noted that further treatment would be based on Plaintiff's response to the injection treatment.  (R. 240.)  On February 15, 2008, Dr. Rowe observed that Plaintiff had been "experiencing constant lower back pain radiating intermittently down the right lower extremity" and that physical therapy continued to provide "only partial relief."  (R. 235.)  Plaintiff continued with the same medications.  (R. 235.)

Plaintiff visited with Dr. Rowe on multiple additional occasions to discuss pain management.  On April 11, 2008, Plaintiff reported to Dr. Rowe that the relief provided by the injection treatment was only "short-term," and that the effects of the last injection lasted only a week.  (R. 230.)  Plaintiff stated that the radicular symptoms had "improved," and were "only intermittent."  (R. 230.)  However, his back pain was "persistently worse on the right side."  (R. 230.)  Dr. Rowe observed that Plaintiff ambulated without assistance, had intact sensation and strength, and was in "no apparent distress."  (R. 230.)  Plaintiff used Vicodin Extra Strength

as needed to manage pain.  (R. 230.)  On June 20, 2008, Dr. Rowe reiterated his observations of Plaintiff's symptoms and treatment history.  (R. 227–28.)  Plaintiff had been using Vicodin Extra Strength up to three to four times a day to manage pain and stated that he continued to suffer lower back pain.  (R. 227.)  On July 21, 2008, Plaintiff told Dr. Rowe that he had been reconsidering his hesitancy to pursue surgical intervention.  (R. 226.)  Dr. Rowe prescribed Lyrica to manage Plaintiff's pain.  (R. 226.)

On March 12, 2009, Plaintiff indicated that he had obtained a second opinion regarding surgery, at the police department's request.  (R. 212.)  At a May 11, 2009 visit, Plaintiff indicated that he was seeking authorization from his employer to proceed with surgery.  (R. 210.)  Plaintiff continued to suffer lower back pain and was treating his pain with daily Vicodin Extra Strength.  (R. 211.)

Plaintiff did not see Dr. Rowe again until May 26, 2010, after he had undergone surgery in June of 2009.[2]  (R. 209–10.)  The pain down Plaintiff's right lower extremity was gone, but he was experiencing primarily left-sided lower back pain, which he was managing with Motrin and Skelaxin.  (R. 209.)  Dr. Rowe observed that Plaintiff ambulated without assistance and had a normal gait.  (R. 209.)  Plaintiff's lower extremity strength and sensation to light touch were largely intact.  (R. 209.)  Plaintiff's seated straight leg raise was negative bilaterally and he had minimal left sacroiliac joint tenderness.  (R. 209.)  A Patrick's test, which evaluates the hip joint, was mildly positive on the left.  (R. 209.)

### ii.  MRIs

An MRI performed on Plaintiff on March 6, 2007 revealed disc herniation at L4–5, extruding to the L5 level, disc bulge at L5–S1, and degenerative discs at L4–5 and L5–S1.

---

[2]  Plaintiff was also participating in physical therapy at the time of his May 26, 2010 visit.

(R. 264, 276–77.)  A second MRI performed on Plaintiff in August of 2008 showed severe

degenerative discs at L4–L5 and L5–S1, with the L4–L5 herniation noted as quite large and

increasingly extruded and compressed since the previous study.  (R. 221, 273.)

A post-operative lumbar spine MRI taken on September 17, 2009 revealed slight

impingement upon the thecal sac, but definite impingement upon the neural foramina bilaterally

at L4–5 and L5–S1.  (R. 270.)  An MRI of Plaintiff's lumbar spine conducted on March 29, 2010

showed laminectomy at L5–S1, no spondylolysis or spondylolisthesis and degenerative disc

changes at L4–5.  (R. 271.)  An MRI on December 7, 2010 revealed resection of herniated disc at

the L4–5 level, small posterolateral disc at the L4–5 level, which with clinical correlation,

represented post-operative changes and without impingement.  (R. 331.)  There was no spinal

stenosis or foraminal narrowing.  (R. 331.)

### iii.   Dr. Richard Radna

Plaintiff first saw neurosurgeon Richard J. Radna, M.D., on February 25, 2009.  (R. 328.)

Dr. Radna recounted Plaintiff's accident and medical history.  (R. 328.)  Plaintiff reported that,

after his accident, he experienced lumbosacral pain, right-sided with radiation down the right

lower extremity to the right foot, which had been constant.  (R. 328.)  On examination, Dr.

Radna observed "severe spasm" in Plaintiff's lower back muscles with 80% restricted range of

motion around the lumbosacral spine and limitations in Plaintiff's lumbar flexion and lumbar

extension.  (R. 328.)  The Patrick's test for thigh rotation was "severely restricted" with

extension of five degrees.  (R. 328.)  Dr. Radna's "[i]mpression was that of a lumbo-sacral

musculoskeletal and radicular pain syndrome."  (R. 328.)  Dr. Radna recommended

decompression and stabilization surgery of the lumbar spine.  (R. 328.)  Plaintiff had follow-up

visits with Dr. Radna on April 30, 2009 and May 20, 2009, and Dr. Radna made the same observations on examination and recommendations each time. (R. 329.)

In June of 2009, Plaintiff underwent a two-part spinal surgery, performed by Dr. Radna at St. Joseph's Medical Center in Yonkers, New York. On June 12, 2009, Plaintiff underwent surgery for decompression at L4–L5, and L5–S1. (R. 279–99, 329.) On June 18, 2009, Plaintiff underwent L4–L5 and L5–S1 discectomy and inter-body stabilization. (R. 300–14, 329.)

On November 15, 2010, at a follow-up visit with Dr. Radna, Plaintiff complained of "persistent" back pain but relief in his radicular pain. (R. 329.) On December 16, 2010, at another follow-up visit with Dr. Radna, Plaintiff again reported persistent back pain with relief of radicular pain. (R. 329.) Dr. Radna observed Plaintiff's examination was unchanged, with moderate spasm in the lower back. (R. 329.)

On February 22, 2011, Dr. Radna wrote an unaddressed medical summary of Plaintiff's care, (R. 328–32), and opined that Plaintiff had an ongoing total disability, (R. 332).

On March 21, 2011, Plaintiff was examined by Dr. Radna. (R. 333–34.) Plaintiff complained of persistent mechanical back pain but reported relief of radicular pain. (R. 333.) On examination, Plaintiff had moderate paravertebral spasm in the lumbosacral region, with moderately diminished range of motion around the lumbosacral spine secondary to pain, while straight leg raise testing was moderately restricted bilaterally. (R. 333.) Dr. Radna again opined that Plaintiff was totally disabled and recommended use of a spinal brace to stabilize the lumbosacral region and diminish radicular irritation due to vertebral movement. (R. 333.) Dr. Radna prescribed Motrin, Zantac, Skelaxin and Elavil, a Flector patch, and a physical therapy program based on swimming. (R. 333.)

### iv. Empire Physical Therapy

Plaintiff began post-surgery physical therapy at Empire Physical Therapy in September of 2010. (R. 614–24.) On September 29, 2010, Plaintiff stated that he experienced constant pain and rated the severity of the pain, at its worst, as a four on a scale of one to ten. (R. 614.) Plaintiff reported that his back pain restricted his activities and that he experienced mild loss of motion, slight swelling, mild weakness, mild loss of function and slight spasms. (R. 614.) Plaintiff also reported being able to stand comfortably for up to ten minutes at a time, sitting for fifteen minutes continuously, and walking up to one-half mile at a time. (R. 614.)

On multiple dates in October and November of 2010, Plaintiff went to physical therapy, rated his pain, at its worst, at a four of ten, and complained of pain in the lumbosacral area. (R. 581, 588, 592–93, 595–96, 598, 603–05, 611.) Plaintiff consistently reported that the pain restricted his activities and caused him the same mild loss of motion, swelling, weakness and loss of function. (R. 605, 611.) Plaintiff's gait was regularly slightly antalgic. (R. 581, 588, 593.) At further physical therapy sessions on December 3 and 8, 2010, January 3, 2011, and February 3 and 10, 2011, Plaintiff reported similar pain and symptoms. (R. 525–26, 529–30, 558, 571–72, 574–75.) On February 23, 2011, Plaintiff rated his pain as a five out of ten. (R. 521.)

Plaintiff continued to attend physical therapy multiple times each month throughout 2011. On multiple occasions in March, April, and May of 2011, Plaintiff's gait remained a "trace antalgic." (R. 456, 465, 479, 485, 490, 500, 505, 508, 511.) From April to September of 2011, Plaintiff consistently rated his pain level as four of ten and described his pain as intermittent. (R. 360, 363, 366, 371, 374, 376, 379, 382, 400, 402, 405, 408, 411, 441, 444, 461, 467, 470, 473, 475, 478, 481, 484, 487, 490.) On multiple occasions, Plaintiff reported that he

was able to walk one-half mile.  (R. 400, 405, 411.)  By September of 2011, Plaintiff stated that the pain did not restrict his activities.  (R. 360.)

In October, November and December of 2011, Plaintiff reported that his pain was, at worst, only a three of ten, that it was intermittent, and that it did not restrict his activities. (R. 335, 340, 344, 347, 350, 353, 356, 358.)  Plaintiff's gait was normal and he was able to walk one-half mile.  (R. 335, 340, 341, 344, 347, 350, 356.)  Plaintiff reported that his back pain was aggravated by bending forward for ten to twenty minutes, driving for ten to twenty minutes, and walking for ten to twenty minutes.  (R. 335, 340, 344, 350, 356.)  He stated that his loss of motion and function were only to a "mild degree."  (R 335, 342, 347, 353.)  Plaintiff's lower extremity muscle strength was full ("5/5").  (R. 336, 342.)  On December 2, 2011, Plaintiff was discharged from physical therapy, having met 80% of his goals and having reached "plateaued progress."  (R. 336.)

### v.  Dr. Mahendra Misra, consultative medical examiner

On June 7, 2012, Dr. Mahendra Misra, M.D., conducted a medical examination of Plaintiff at the request of the Social Security Administration.  (R. 320–25.)

Dr. Misra identified Plaintiff's chief complaint as lower back symptoms.  (R. 320.) Plaintiff recounted to Dr. Misra the history of his motor vehicle accident and lumbosacral spinal fusion surgery in June of 2009.  (R. 320.)  Plaintiff described his pain as constant and ranging from a three to an eight on a scale of one to ten.  (R. 321.)  Plaintiff reported to Dr. Misra that the pain was localized, but caused tingling in the outer aspect of Plaintiff's right thigh.  (R. 321.) Plaintiff told Dr. Misra that he was not in physical therapy at the time and was managing his pain with over-the-counter medications.  (R. 321.)

Dr. Misra noted that Plaintiff had driven himself to the examination, and that Plaintiff was able to manage his own personal hygiene. (R. 321.) Plaintiff reported that he had sleep apnea and had difficulty sleeping. (R. 321.) Plaintiff stated that he was able to stand for ten to fifteen minutes and to sit for, on average, fifteen to twenty minutes continuously. (R. 321). Plaintiff was able to walk for up to two blocks continuously and could lift up to ten pounds. (R. 321–22.)

On examination, Dr. Misra observed that Plaintiff was "in no acute distress." (R. 322.) Dr. Misra noted that Plaintiff, at a height of 5 feet 9 inches and weight of 288 pounds, was "grossly overweight." (R. 322.) Plaintiff was able to walk heel-to-toe, "more or less normal walking," but could "squat only half way." (R. 322.) Plaintiff's posture was erect, and he was able to get on and off the examination couch by himself. (R. 322.) His deep tendon reflexes in the upper and lower limbs were normal and equal on both sides, and there was "no evidence of motor or sensory deficits." (R. 322.) The movements of Plaintiff's cervical spine were full and his upper limbs had a normal range of motion. (R. 322.) Plaintiff had "restricted" thoracic and lumbar spine movements. (R. 322.) Dr. Misra observed "evidence of muscle spasm in the paravertebral lumbosacral group of muscle" and that there was no muscle atrophy. (R. 322.)

Dr. Misra diagnosed "status post lumbosacral spinal fusion surgery with continuation of radiculopathy" and obesity. (R. 323.) Dr. Misra opined that it would "not be possible for [Plaintiff] to do jobs which require prolonged standing, sitting, walking, running, climbing, crawling, crouching, lifting, pulling or pushing." (R. 323.)

### c. Additional evidence

#### i. Function report

On April 22, 2012, Plaintiff completed a function report as part of his application for disability benefits.  (R. 162–173.)  Plaintiff stated that he could no longer work due to lower back pain that was brought on by walking, standing, and sitting for long periods of time.  (R. 171, 173.)  He first experienced the pain on the date of his accident, December 26, 2006, and shortly after the injury, the pain began affecting his activities.  (R. 170.)  The pain was sharp and piercing, in his middle and left lower back, and the frequency and duration of the pain varied.  (R. 170–71.)  Plaintiff had good days and days when he was capable of fewer activities.  (R. 170.)  Plaintiff was not taking any pain medications at the time and instead he relied on walks and hot showers for pain relief.  (R. 171–72.)

Plaintiff was unable to walk or stand for long periods of time, and both the distances he was able to walk and the amount of time that he needed to rest varied.  (R. 167–69.)  When sitting, it took Plaintiff a long time to get comfortable.  (R. 168.)  Plaintiff explained that kneeling and squatting were painful and that he was only able to climb stairs slowly.  (R. 168.)  Plaintiff noted that walking, standing or sitting for long periods of time triggered pain.  (R. 171.)  On "good days," Plaintiff could perform light lifting.  (R. 167.)

Plaintiff was able to dress and bathe himself, although it took him "longer" to do so.  (R. 163.)  It was sometimes uncomfortable to use the toilet.  (R. 164.) Plaintiff explained that it took longer for him to get comfortable while trying to fall asleep.  (R. 163.)  Plaintiff cared for his sons, including getting them up and ready for school and ensuring that they did their school work.  (R. 163.)  However, his wife helped care for the children, and Plaintiff's ability to participate in physical activities with his sons was limited.  (R. 163.)  Plaintiff occasionally

prepared meals; otherwise, his wife prepared them.  (R. 164–65.)  Plaintiff did not perform any household chores or do house or yard work due to pain, although at times he would "attempt to help [his wife] depending on the severity of the pain."  (R. 165.)  Plaintiff was able to do "light grocery shopping" to assist his wife.  (R. 166.)  Plaintiff was able to drive a car and go out of the house alone.  (R. 165–66.)  He was also able to bills, count change and handle money.  (R. 166.)  Plaintiff occasionally spent time with others, and that he had attempted to attend church and go to sporting events, depending on the severity of pain. (R. 167.)

Plaintiff did not need reminders to care for his personal needs or take medicine and that he did not have trouble remembering things.  (R. 164, 170.)  Plaintiff was able to finish what he started, but he had problems paying attention due to pain.  (R. 169.)  Plaintiff was able to follow spoken and written instructions and did not have difficulty getting along with others.  (R. 169.)

### d.    The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the Social Security Act (the "SSA").  First, the ALJ found that Plaintiff met the insured status requirements of the SSA through December 31, 2015, and that Plaintiff had not engaged in substantial activity since September 1, 2010, the alleged onset date.  (R. 11.)  Second, the ALJ found that Plaintiff had the following severe impairments: lumbar disc herniations and asthma.  (R. 11.)  Third, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or is equal to the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations.  (R. 11.)  The ALJ considered Listings 1.04, pertaining to disorders of the spine, and 3.03, pertaining to asthma, and determined that Plaintiff's impairments do not meet or medically equal the criteria of those listings.  (R. 11–12.)

Next, the ALJ determined that Plaintiff "has the residual functional capacity to perform sedentary work as defined in 20 CFR [§] 404.1567(c)," except that Plaintiff is able to "frequently climb ramps and stairs, and occasionally climb ladders, ropes, and scaffolds" and can "occasionally stoop, crouch, and kneel." (R. 12.) The ALJ further found that Plaintiff can "never crawl" and "can only occasionally push or pull with the bilateral upper extremities." (R. 12.) The ALJ found that Plaintiff "must avoid concentrated exposure to extreme heat and colt, wetness and humidity, and pulmonary irritants such as fumes, odors, dust, gases, poorly ventilated areas, and chemicals." (R. 12.) As to Plaintiff's disability, the ALJ determined that, while Plaintiff's "medically determinable impairments could reasonably be expected" to cause Plaintiff's symptoms, Plaintiff's statements concerning the "intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 12.)

The ALJ noted that Plaintiff's asserted inability to work was "not consistent" with his "reported capacity for activities of daily living, including assisting in the care of his sons, occasionally preparing simple food, driving a car, and shopping in stress with his wife for groceries." (R. 12.) The ALJ observed that Plaintiff "stated that he could follow both written and verbal instructions" and could "finish what he started," despite having reported attention issues due to pain. (R. 12.) The ALJ further stated that Plaintiff "retained the mental capacity for shopping, counting change, paying bills, and handling a savings account," despite the reported pain. (R. 13.)

The ALJ concluded that the RFC was supported by a record that "demonstrates lumbosacral and respiratory impairment, despite [Plaintiff's] course of treatment, which included medications, physical therapy, and surgery." (R. 15.) The ALJ also found the RFC to be "consistent with treatment and physical therapy records, which demonstrate improved range of

motion and pain with treatment" and "reflective" of Plaintiff's reported capacity for daily activities and for "maintaining concentration, persistence, and pace." (R. 15.)

In reaching this conclusion, the ALJ accorded "only some weight" to the opinion of treating neurosurgeon Dr. Radna, who opined that Plaintiff was "totally disabled," because the ALJ found that Dr. Radna's opinion was "not supported by the evidence of [the] record as a whole, including his own treatment records." (R. 13.) The ALJ explained that Dr. Radna's treating records "demonstrate improvement" in Plaintiff's pain and "relief of his radiculopathy with his course of treatment" and that Dr. Radna "found moderate limitations," inconsistent with a conclusion of "total disability." (R. 13.)

The ALJ also accorded "only some" weight to the opinion of the consultative examiner, Dr. Misra, who opined that Plaintiff was "unable to do jobs that required prolonged standing, sitting, walking, running, climbing, crawling, crouching, lifting, pushing, or pulling." (R. 14.) The ALJ found that, while Dr. Misra's opinion was "more supported than not by the evidence of the record, which demonstrated persistent low back symptoms" despite treatment, the opinion "does not specify the degree to which [Plaintiff] was limited in . . . exertional and postural activities." (R. 14.)

Finally, the ALJ determined that Plaintiff was not capable of performing his prior relevant work as a police officer, because that job required tasks that exceeded the RFC assessed by the ALJ. (R. 15.) The ALJ concluded that, given Plaintiff's age, education, work experience, and RFC, there are jobs in the national economy in significant numbers that Plaintiff could perform. (R. 15.) Therefore, the ALJ determined that, from September 1, 2010 through the date of his decision, Plaintiff had not been suffering from a "disability" as this term is defined under the SSA. (R. 16.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'"

*McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008)

(alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

  **b.**   **Availability of benefits**

  Federal disability insurance benefits are available to individuals who are "disabled"

within the meaning of the Social Security Act.  To be considered disabled under the Act, a

plaintiff must establish his or her inability "to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than twelve months."  42 U.S.C. §§ 423(d)(1)(A).  The impairment must be of "such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the

national economy."  *Id.* §§ 423(d)(2)(A).  The Commissioner has promulgated a five-step

analysis for evaluating disability claims.  20 C.F.R. §§ 404.1520.  The Second Circuit has

described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed.  If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work.  If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations.  When the claimant has such an impairment, the [Commissioner] will find the claimant disabled.  However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work.  Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.  If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims"); *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c. Analysis

The Commissioner moves for judgment on the pleadings, arguing that the ALJ's decision is supported by substantial evidence and that the ALJ satisfied his burden at step five of the disability analysis. (Comm'r Mem. 14–21.) Plaintiff cross-moves for judgment on the pleadings, arguing that the ALJ's findings were inconsistent with the medical record and that the ALJ did not adequately support his conclusion that there are jobs available to Plaintiff, given an RFC of less than a full range of sedentary work activity. (Pl. Mem 5–7.)

### i. The ALJ's RFC determination was supported by substantial evidence

Plaintiff argues that the ALJ's determination was not supported by substantial evidence because, in substance, the ALJ's findings (1) were inconsistent with Dr. Radna's opinion that Plaintiff was "totally disabled" and Dr. Misra's assessment of Plaintiff's capacities and (2) relied on Plaintiff's function report as evidence of Plaintiff's ability to perform sedentary work. (Pl. Mem. 5–6.) The Commissioner argues that the RFC determination was supported substantial evidence because (1) the ALJ appropriately gave Dr. Misra's opinion only "some" weight, and (2) it was consistent with the treating records of Drs. Rowe and Radna, the physical therapy records, and Plaintiff's self-reported capacities and treatment history. (Comm'r Mem. 15–19.)

An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545. With respect to a claimant's physical abilities,

an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis. *Id*. § 404.1545(b). For example, "a limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id*. In determining the RFC, "the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 312 (W.D.N.Y. 2013) (alteration in original) (quoting *Stanton v. Astrue*, No. 07-CV-0803, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(b–e)), *aff'd*, 370 F. App'x (2d Cir 2010)). "Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) (first citing *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000); and then citing *Zorilla v. Chater*, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996)).

"Before an ALJ classifies a claimant's RFC based on exertional levels of work (*i.e.*, whether the claimant can perform sedentary, light, medium, heavy or very heavy work) he 'must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . .'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)). Social Security Ruling 96-8p notes that "a failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an

individual's limitations or restrictions."  *Id.* at 176 (quoting SSR 96–8p, 1996 WL 374184, at *4).  The Second Circuit has held that failure to conduct an explicit function by function analysis at the RFC finding step is not *per se* error requiring remand, but it has reiterated that "remand may be appropriate, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record."  *Id*. at 177.

Substantial evidence supports the ALJ determination that Plaintiff has the RFC to perform less than a full range of sedentary work.  (R. 12.)  In reaching his RFC determination, the ALJ relied on: (1) objective medical evidence, including treatment and physical therapy records, (2) the medical opinions of Drs. Radna and Misra, both of which he accorded "some" weight, and (3) Plaintiff's self-reported symptoms and capacities.  (R. 12–13.)  The ALJ explained that, while all of these sources showed lumbosacral impairment, the evidence demonstrated that Plaintiff's treatment resulted in improved range of motion and pain management, and that Plaintiff's limitations did not preclude work during the period for which Plaintiff seeks benefits, September 1, 2010 through September 1, 2012.

The ALJ assessed Plaintiff's RFC after a full review of the evidence, expressly citing to medical opinions and clinical findings and describing in detail the history of Plaintiff's pain management, physical therapy, spinal surgery and post-surgical treatment.  The ALJ noted that a March 29, 2010 post-operative MRI of Plaintiff's lumbar spine showed degenerative disc changes, but no spondylolysis or spondylolisthesis.  (R. 13; *see* R. 271.)  The ALJ observed that, after earlier pain management with Dr. Rowe, when Plaintiff returned for a post-operative session on May 26, 2010, Plaintiff reported that the pain down his right lower extremity was gone.  (R. 13.)  At that time, Plaintiff was experiencing left-sided lower back pain, and was managing the pain with Motrin and Skelaxin, but Dr. Rowe observed that Plaintiff nevertheless

ambulated without assistance and had a normal gait. (R. 13; *see* R. 209.) Dr. Rowe further noted that that Plaintiff's lower extremity strength and sensation to light touch were "largely intact," that his seated straight leg raise was negative, and that Plaintiff had minimal left sacroiliac joint tenderness. (R. 13; *see* R. 209.)

The ALJ discussed Plaintiff's physical therapy treatment and its efficacy in increasing Plaintiff's range of motion and decreasing his pain. From October of 2010 to October of 2011, Plaintiff consistently rated his pain as a four out of ten, and reported only mild loss of motion, swelling, weakness and loss of function. (R. 13; *see, e.g.*, 360, 400, 581, 611.) His gait was regularly just slightly antalgic. (R. 13; *see, e.g.*, R. 456, 508, 593.) Plaintiff consistently reported being able to walk one-half mile. (R. 13; *see, e.g.*, R. 405, 411.) In October, November and December of 2011, Plaintiff reported that his pain was, at worst, a three out of ten, that it was intermittent, and that it did not restrict his activities. (*See* R. 335, 340, 344, 347, 350, 353, 356, 358.) By that time, Plaintiff's gait had become normal. (R. 13; *see* R. 335, 340, 341, 344, 347, 350, 356.) Plaintiff reported that he could bend forward for ten to twenty minutes before his back became aggravated, and that he had loss of motion and function only to a "mild degree." (*See* R. 335, 340, 344, 347, 350, 353, 356.) The ALJ observed that Plaintiff was discharged from physical therapy in December of 2011, having met 80% of his goals. (R. 14; *see* R. 366.)

The ALJ also considered Plaintiff's post-operative visits with Dr. Radna and explained that Plaintiff reported relief of his radicular pain, while continuing to experience persistent mechanical back pain. (R. 13; *see* R. 333, 329.) The ALJ observed that, in March of 2011, Dr. Radna examined Plaintiff and found that Plaintiff had only moderate paravertebral spasm in the lumbosacral region, moderately diminished range of motion around the lumbosacral spine, and that his straight leg raise testing was moderately restricted bilaterally. (R. 13; *see* R. 333.)

With respect to Dr. Radna's opinion that Plaintiff was "totally disabled," the ALJ appropriately accorded it "only some weight," explaining that the opinion was not fully supported by the record including Dr. Radna's own treating records, which show only moderate limitations, as well as relief to Plaintiff's radiculopathy and pain with treatment.  (R. 13.) Moreover, "a treating physician's statement that the claimant is disabled cannot itself be determinative."  *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same).  A treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record."  20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).  Here, Dr. Radna did not opine as to Plaintiff's capacities and impairments, but instead solely stated that Plaintiff's disability was "total."  (R. 333.)  As such, this opinion "cannot itself be determinative," and it was appropriate for the ALJ to assess its weight as less than controlling.  *See Micheli*, 501 F. App'x at 28.

Similarly, the ALJ appropriately accorded "some," but not controlling, weight to the opinion of Dr. Misra, who opined that Plaintiff was "unable to do jobs that required prolonged standing, sitting, walking, running, climbing, crawling, crouching, lifting, pushing, or pulling,"

as Dr. Misra did not explain the limits to these exertional activities with any specificity. (R. 14.) The ALJ found that Dr. Misra's opinion was "more supported than not by the evidence of the record, which demonstrated persistent low back symptoms" despite treatment. (R. 14.) However, the ALJ also emphasized that Dr. Misra did not opine as to "the degree to which [Plaintiff] was limited in . . . exertional and postural activities." (R. 14.) Given the absence of specificity in Dr. Misra's opinion, it would have been inappropriate for the ALJ to consider it determinative or rely on the opinion to provide substantial evidence for Plaintiff's RFC. *See Selian*, 708 F.3d at 421 ("[The consultative examiner's] opinion is remarkably vague. What [the consultative examiner] means by 'mild degree' and 'intermittent' is left to the ALJ's sheer speculation. . . . [The] opinion does not provide substantial evidence to support the ALJ's finding that [the claimant] could lift 20 pounds occasionally and 10 pounds frequently."); *Ubiles v. Astrue*, No. 11-CV-6340, 2012 WL 2572772, at *11 (W.D.N.Y. July 2, 2012) (holding that the consultative examiner's opinion that the plaintiff had "moderate limitations in standing, walking, climbing stairs, and lifting minor weights . . . was entirely too vague to serve as a proper basis for an RFC" (collecting cases)); *Hilsdorf*, 724 F. Supp. 2d at 348 (holding that the consultative examiner's "statement that [the] [p]laintiff had 'limitations of a mild degree of lifting, bending, walking, standing, and pushing and pulling on arm controls'" could not "serve as an adequate basis for determining [the] [p]laintiff's RFC"). Plaintiff's RFC reflects the reduced weight given to Dr. Misra's findings, in that the ALJ concluded that Plaintiff could perform only sedentary work, and that he cannot crawl and can only occasionally stoop, crouch, and kneel. (*See* R. 12.)

Finally, the ALJ considered Plaintiff's own reported capacity for daily activities. The ALJ observed that Plaintiff reported contributing to food preparation, caring for his sons, shopping and driving. (R. 12.) He also acknowledged Plaintiff's statement that, despite reported

attention issues due to pain, he could "finish what he started," and he "retained the mental capacity for shopping, counting change, paying bills, and handling a savings account." (R. 13.) Plaintiff argues that "even a cursory reading" of Plaintiff's function report "mandates a conclusion quite the opposite of the one reached by the ALJ" because Plaintiff also referenced his back pain and limitations in his ability to do household chores. (Pl. Mem. 6.) However, the ALJ did not ignore the statements that Plaintiff emphasizes. Nor did the ALJ only rely on Plaintiff's self-reported capacities for some daily activities and mental tasks to determine the RFC. Rather, the ALJ indicated that Plaintiff's self-reported capacity for daily activities was one source of evidence that bolstered the ALJ's conclusion as to Plaintiff's RFC. *See, e.g.*, *Indelicato v. Colvin*, No. 13-CV-4553, 2014 WL 674395, at *3-5 (E.D.N.Y. Feb. 21, 2014) ("[T]he ability to perform many specific daily activities does not itself mean that [the plaintiff] is not disabled. But taken together, these activities give texture both to medical diagnosis and subjective accounts, and they provide an important objective basis by which to evaluate a person's symptoms. . . . A claimant's daily activities are precisely the kind of evidence on which the ALJ must rely in order to assess how medical conditions actually affect a person's experience." (citing 20 C.F.R. § 416.929(a)).

In sum, the RFC determination was supported by substantial evidence provided by the treating records of Drs. Rowe and Radna, the physical therapy records and Plaintiff's self-reported capacities and treatment history, and is consistent with appropriately weighted opinions from Drs. Radna and Misra.

### ii. The ALJ met his burden at step five

Plaintiff argues that the ALJ's reliance on Appendix 2 of the Medical Vocational Guidelines was "inappropriate" because the ALJ concluded that Plaintiff has an RFC for less

than the full range of sedentary work and that, in substance, the ALJ did not meet his burden at step five because he "adduced no evidence — vocational or other — to establish the quantity of jobs" available for Plaintiff's RFC. (Pl. Mem. 6.) The Commissioner argues that the ALJ properly determined that Plaintiff could perform work existing in significant numbers in the national economy and that the finding was supported by substantial evidence. (Comm'r Mem. 20–21.)

At step five, "the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v)). An ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert. *See McIntyre*, 758 F.3d at 151. An ALJ's conclusion that jobs exist in significant numbers during the period at issue must be based on some evidence beyond the ALJ's own intuition or speculation. *See Cosnyka v. Colvin,* 576 F. App'x 43, 46 (2d Cir. 2014) (finding an ALJ's conclusion that there were jobs the plaintiff could perform was not based on substantial evidence because it stemmed from the ALJ's own conclusions, rather than the record); *see also Wilson v. Barnhart,* 284 F.3d 1219, 1227 (11th Cir. 2002) (stating that an administrative law judge's findings in step five, as to which jobs a claimant is able to perform must be "supported by substantial evidence, not mere intuition or conjecture.") (citation omitted).

If a claimant "has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)). A nonexertional impairment "significantly limit[s] a claimant's range of work when it causes an additional loss of work capacity beyond a negligible one or, in other words,

one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* at 411 (citation and internal quotation marks omitted). "If, however, a claimant does not have such limitations, the ALJ may rely on the medical vocational guidelines . . . to adjudicate the claim." *Woodmancy v. Colvin*, 577 F. App'x 72, 76 (2d Cir. 2014); *see Lewis v. Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013) ("[Where the ALJ determined that [the claimant's] additional limitations did not significantly limit his capacity to perform light work — a determination supported by the record evidence — it was not error to rely on the Medical-Vocational Guidelines to determine that jobs existed in the economy that [the claimant] could perform.").

At the fifth step of the sequential evaluation, the ALJ met his burden of showing that there is other work that Plaintiff could perform. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). After considering Plaintiff's age, education, and training, the ALJ applied Medical-Vocational Rule 201.29, explaining that Plaintiff had no nonexertional impairments and that Plaintiff's additional limitations did not limit the available jobs. (R. 16.) This conclusion was supported by substantial evidence, including Plaintiff's testimony that, despite his pain, he maintained mental capacity for memory and daily tasks. (R. 12.) The ALJ further explained that "[l]imitations or restrictions on the ability to push or pull will generally have little effect on the unskilled sedentary occupational base." (R. 16.) Given these findings, it was not error for the ALJ to rely on the Medical-Vocational Guidelines to conclude that jobs existed in the economy that Plaintiff could perform. *See Lawler v. Astrue*, 512 F. App'x 108, 112 (2d Cir. 2013) ("Since the ALJ used the medical-vocational guidelines, she did not need to list specific jobs that Lawler could perform.").

### III. Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted and Plaintiff's cross-motion for judgment on the pleadings is denied. The Clerk of Court is directed to close this case.

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: August 17, 2016
Brooklyn, New York